IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**BIBIJI INDERJIT KAUR PURI;
RANBIR SINGH BHAI; KAMALJIT
KAUR KOHLI; KULBIR SINGH PURI,**

        Plaintiffs,

      v.

**SOPURKH KAUR KHALSA;
PERAIM KAUR KHALSA; SIRI
RAM KAUR KHALSA; KARTAR
SINGH KHALSA; KARAM SINGH
KHALSA; SIRI KARM KAUR
KHALSA; ROY LAMBERT;
SCHWABE, WILLIAMSON &
WYATT**, an Oregon Professional
Corporation; **LEWIS M. HOROWITZ;
LANE POWELL PC**, an Oregon
Professional Corporation; **UNTO
INFINITY, LLC**, an Oregon Limited
Liability Company; **SIRI SINGH
SAHIB CORPORATION**, an Oregon
non-profit corporation; **GURUDHAN
SINGH KHALSA; GURU HARI SINGH
KHALSA; AJEET SINGH KHALSA;
EWTC MANAGEMENT, LLC; DOES, 1–5,**

        Defendants.

No. 3:10-cv-01532-MO

OPINION AND ORDER

**MOSMAN, J.,**

    This matter comes before me on Plaintiffs' Motion for Partial Summary Judgment [389]

and Defendants' Motion for Summary Judgment [390]. The parties also filed several motions to

1 – OPINION AND ORDER

strike. [418, 424, 428]. For the reasons below, I GRANT Defendants' Motion for Summary Judgment [390], DENY Plaintiffs' Motion for Partial Summary Judgment [389], and DENY or DENY as moot the parties' Motions to Strike [418, 424, 428].

## BACKGROUND

### I.      Factual Background

This dispute revolves around the now deceased Siri Singh Sahib Bhai Sahib Harbhajan Singh Khalsa Yogiji, aka Yogi Bhajan. Yogi Bhajan was a Sikh Dharma spiritual leader who helped promulgate the Sikh religion and Kundalini Yoga in the United States until his death in 2004. In 1971, Yogi Bhajan became "Siri Singh Sahib," or the Chief Religious and Administrative Authority for the Ordained Ministry of Sikh Dharma in the Western Hemisphere. Gurujot Decl. [396], ¶¶ 6, 8. Pursuant to his role as Siri Singh Sahib, Yogi Bhajan established numerous non-profit organizations and for-profit businesses. This case involves three of these organizations: Sikh Dharma International (SDI), Siri Singh Sahib Corporation (SSSC), and Unto Infinity, LLC (UI).

The Plaintiffs in this case are Bibiji Inderjit Kaur Puri, Ranbir Singh Bhai, Kamaljit Kaur Kohli, and Kulbir Singh Puri, the widow and three children of Yogi Bhajan.[1] The Defendants remaining in this case are UI, SSSC, Sopurkh Kaur Khalsa, the President and a member of the UI Board of Managers and a member of the SSSC Board of Trustees, and Kartar Singh Khalsa, a member of the UI and SSSC boards. Plaintiffs allege in the operative Second Amended Complaint (SAC) that after Yogi Bhajan's death on October 6, 2004, the individual Defendants conspired to exclude them from management of UI and SSSC. SAC [234] ¶¶ 24–29. They seek declaratory relief placing them on the boards and monetary damages.

---

[1] This opinion will refer to certain individuals in this case by their first names to distinguish from others who have the same last name.

## A. SDI

SDI is a California nonprofit religious corporation. Gurujot Decl. [396], ¶ 13; *id.* Ex. 1.

It is undisputed that SDI is a religious organization. SDI, which was originally named Sikh

Dharma Brotherhood, was formed in 1973 for the following primary purposes:

> [T]o operate for the advancement of education, science and religion and for charitable purposes by the distribution of its funds for such purposes by operating as a religious organization and as association of religious organizations, by teaching the principles of the Sikh Dharma, or way of life, in the Western Hemisphere and including, but not limited to, the creation and operation of places of worship, the ordination of ministers of divinity, the creation and operation of educational centers and associated and supportive activities related to these primary purposes.

Gurujot Decl. [396], Ex. 1 (SDI Articles of Incorporation). SDI's 2003 Bylaws, which were in

effect at the time of the events underlying this case, stated:

> [SDI] is organized and shall be operated exclusively for the purposes of operating as a religious organization and as an association of religious organizations by teaching the principles of the Sikh Dharma, or way of life; by creation and operation of places of worship; by ordination of ministers of divinity; by creation and operation of educational centers; and by the conduct of associated and supportive activities related to these purposes; and to do all things necessary, expedient or appropriate to the accomplishment of the purposes for which this corporation is formed.

*See* Gurujot Decl. [396], Ex. 9 at 1. And SDI receives a tax exemption as "a church or a convention

or association of churches" under 26 U.S.C. § 501(c)(3) and § 170(b)(1)(A)(i). Gurujot Decl.

[396], Ex. 4.

Prior to Yogi Bhajan's death, there were two individual religious positions in SDI: the

Siri Singh Sahib and the Bhai Sahiba. Yogi Bhajan, in his role as Siri Singh Sahib, served as the

chief religious authority of SDI, and the Bhai Sahiba "over[saw] religious protocol." Gurojodha

Decl. [395], Ex. 3 at 31. Following Yogi Bhajan's death, the "Siri Sikdar Sahib/a and the Bhai

Sahib or Bhai Sahiba [are] together . . . the chief authority on the teachings of Siri Singh Sahib

Harbhajan Singh Khalsa Yogiji on the practice of Sikh Dharma." Gurojot Decl. [396], Ex. 9 at

10. The Bhai Sahiba advises SDI, the Khalsa Council, and UI on religious matters. Gurojot Decl.

[396], Ex. 9 at 13. The Siri Sikdar Sahib/a "shall champion the spiritual and secular education of

the children of Sikh Dharma" and "shall devote time daily for meditation and prayer on behalf of

the congregations of Sikh Dharma, shall be responsible through the office of the Bhai Sahib/a for

maintaining and improving the quality of spiritual practice in Western hemisphere communities

and for inspiring and promoting devotion to Shabd Guru." Gurojot Decl. [396], Ex. 9 at 12.

Additionally, the 2003 SDI Bylaws call for the Siri Sikdar Sahib/a to lead annual pilgrimages

and perform outreach to other Sikh religious leaders. Gurojot Decl. [396], Ex. 9 at 12.

SDI's bylaws also outlined several governing boards, including an advisory board of SDI

ministers called the Khalsa Council, which advises UI "on matters of significance" to SDI, and a

board of directors called the Khalsa Council Adh Kari. Gurojot Decl. [396], Ex. 9 at 8.

## B. SSSC

SSSC is an Oregon nonprofit religious corporation formed in 1997 "to take over the

leadership function of [Yogi Bhajan] after his death." Gurojodha Decl. [395], Ex. 3 at 30.

SSSC's purposes include overseeing the "administration and program services" of SDI and

"conduct[ing] and/or facilitat[ing] religious, charitable, and educational activities." Gurojodha

Decl. [395], Ex. 3 at 17, 20; Soni Decl. [394], Ex. C, Art. VI. Like SDI, SSSC receives a tax

exemption as "a church or a convention or association of churches." Gurojodha Decl. [395], Ex. 3

at 2, 25.

During his lifetime, Yogi Bhajan was the sole director of SSSC. Soni Decl. [394], Ex. B

(SSSC Articles of Incorporation), at 3. Following his death, a board of trustees/directors was to

govern SSSC. According to the original SSSC Articles of Incorporation, following Yogi

Bhajan's death or incapacity, "the directors shall be those persons designated in writing by [Yogi Bhajan]. The written designation; and any amendment, or supplement to it, shall be dated upon execution and shall be delivered to, and held in confidence by the attorney for the corporation and Sikh Dharma designated in the corporation's Bylaws." Soni Decl. [394], Ex. B at 3. The original SSSC Bylaws designated Roy Lambert (who was a Defendant in this case until Plaintiffs settled their claims against him) as the attorney for SSSC. Soni Decl. [394], Ex. C, Art. VI. These disputed designations that are at the core of Plaintiff's claims in this case.

The Bylaws also outline certain job duties for the trustees:

> A trustee shall perform his or her duties as a trustee including his or her duties as a member of any committee of the board upon which the trustee may serve, in good faith, in a manner the trustee believes to be in or not opposed to the best interests of the corporation and with such care as an ordinarily prudent person would use under similar circumstances in a like position.

Soni Decl. [394], Ex. C, Art. 2 (Bylaws). The SSSC Articles outline an additional job duty for the board: the Articles state that Yogi Bhajan would designate an individual to succeed to the office of Siri Sikdar Sahib/a, who would also serve as a director of the SSSC board. Soni Decl. [394], Ex. B at 4. But if Yogi Bhajan failed to designate such an individual, the SSSC board was to choose a new Siri Sikdar Sahib/a, with the advice of the Khalsa Council. Soni Decl. [394], Ex. B at 4–5.

Additionally, later amended versions of the Articles of Restatement of SSSC and the Restated Articles of Incorporation required that SSSC board members be qualified as ministers of Sikh Dharma and live "in a manner consistent with the teachings and values of [Yogi Bhajan]." Soni Decl. [394], Ex. E. Although some of these documents were dated October 1–3, 2004, prior to Yogi Bhajan's death, it appears that the documents were actually created in November 2004, after his death. Soni Decl. [394], Ex. DD.

After Yogi Bhajan's death and the subsequent 2012 settlement agreement, SSSC's role within the Sikh Dharma hierarchy changed. The current SSSC board "has the authority to appoint and remove the board members of Sikh Dharma International (SDI), which, among other things, contains the Sikh Dharma Ministry and, through the Ministry, carries out the function of ordaining Sikh Ministers." Gurojodha Decl. [395] ¶ 28. The current mission statement of SSSC[2] reads:

> With the guidance of God and the grace of the Guru it is the mission of the SSSC to protect, preserve and cultivate the prosperity of the constituent community and its assets; listen to, serve and elevate the constituent community; support the non-profit and for profit entities and the family of constituent communities; and live to and hold the values of the teachings of the Siri Guru Granth Sahib and the Siri Singh Sahib Bhai Sahib Harbhajan Singh Khalsa Yogi Ji: selfless service, compassion, kindness, honesty, integrity, trustworthiness and Guru inspired consciousness.

Gurojodha Decl. [395] ¶ 25. The current president of the SSSC board stated that board members "act as representatives and ambassadors of Sikh Dharma. SSSC Board members, myself included, regularly participate in outreach, interfaith, mission building, and Sikh awareness events." Gurojodha Decl. [395] ¶ 39. Finally, the SSSC board president describes the current election process for SSSC as following:

> For the 2012, 2015, and 2017 SSSC Board elections, the elected SSSC Board members were elected by fellow Sikh Dharma ministers, active Khalsa Council members, and members of the Sikh Dharma community pursuant to the terms of the SSSC Board Election Policy. For future elections, and pursuant to a change in the SSSC Board Election Policy, only Sikh Dharma ministers who are in good standing will be eligible to vote for SSSC Board members.

Gurojodha Decl. [395] ¶ 16.

---

[2] Plaintiffs move to strike Defendants' declarations as they pertain to the current status of SSSC, arguing they are irrelevant. I disagree, because I conclude the current status of the boards is pertinent to the question whether relief may be granted in this case without violating the First Amendment, as it pertains to the ecclesiastical abstention doctrine. I therefore DENY Plaintiffs' Motion [424] on these grounds.

## C. UI

Following the death of Yogi Bhajan, SSSC became the sole member of UI, an Oregon nonprofit LLC formed in 2003. UI was the sole member of SDI until 2012, when SSSC assumed this role.[3] Gurujot Decl. [396], ¶ 13; *id.* Ex. 3. Former attorney for Defendants (and former Defendant) Roy Lambert testified that UI was intended to be the "ultimate decision-maker with respect to the . . . [Yogi Bhajan] community" after Yogi Bhajan's death, because Yogi Bhajan felt that the board of SSSC was too large. Soni Decl. [394], Exh. WW at 138. To this end, Yogi Bhajan issued a proclamation on June 30, 2004 stating:

> I hereby proclaim that Unto Infinity, LLC, is the entity authorized by me to continue to exercise the administrative authority of the office of the Siri Singh Sahib of Sikh Dharma, once I no longer occupy that office, in all those cases where authorization by the Siri Singh Sahib is required in the articles, bylaws, or any contractual commitment of a Sikh Dharma affiliated organization.

Southwick Decl. [398], Ex. 44.

A board of managers governs UI. The original operating agreement for UI outlined that Yogi Bhajan would appoint the first UI board. Southwick Decl. [398], Ex. 21 at 1. The original operating agreement for UI also stated that the original agreement would be superseded upon Yogi Bhajan's death by the "Amended and Restated Operating Agreement." Southwick Decl. [398], Ex. 21 at 3. The "Amended and Restated Operating Agreement" outlines certain eligibility standards, including that a board member had to be: (1) qualified as a minister of Sikh Dharma; (2) a member in good standing of the Khalsa Council of the Sikh Dharma; and (3) living, practicing, and participating in the affairs of the Sikh community in a manner consistent with the teachings and values of Yogi Bhajan. Southwick Decl. [398], Ex. 22 at 3–4.

---

[3] I note that Yogi Bhajan appeared to change his mind regarding the intended roles of SSSC and UI, and their relationships to SDI. As of 1997, SSSC was to play the key leadership role in SDI and act as SDI's sole member. UI then took this role in 2003. And following the settlement agreements in 2012, SSSC took over this leadership role yet again.

According to the Bylaws of SDI established in December 2003, as the sole member of SDI, UI was to perform a number of duties related to SDI and the Khalsa Council, including: (1) approving all actions of the Khalsa Council Adh Kari; (2) electing the directors of the Khalsa Council Adh Kari, other than the Siri Sikdar Sahib/a; (3) amending the Articles and Bylaws of SDI; (4) approving the Executive Officers of SDI; (5) choosing the Secretary General of SDI, who would become the new Siri Sikdar Sahib/a if the Siri Sikdar Sahib/a died or was incapacitated; (6) approving the removal of employees, including the Siri Sikdar Sahib/a if the Siri Sikdar Sahib/a died or was incapacitated; (7) appointing the members of the Khalsa Council; and (8) "designat[ing] such other religious or administrative officials of [SDI] as it deems appropriate; . . . defin[ing] or redefin[ing] the function and scope of authority of each such official from time to time; and . . . appoint[ing] and . . . remov[ing] any person from any official position designated by it." Gurojot Decl. [396], Ex. 9 at 2–14. Additionally, UI played a role in determining whether and how a new Siri Sikdar Sahib/a would assume his or her position through a particular type of religious ceremony. *See* Gurojot Decl. [396], Ex. 9 at 10.

### D.  State Court Litigation

On September 21, 2009, several Sikh Dharma ministers and board members of Sikh Dharma entities sued Sopurkh, Kartar, UI, SSSC, and several other defendants derivatively, on behalf of the Sikh Dharma Community. The State of Oregon subsequently sued the same parties, and the state court consolidated these cases. McGrory Decl. [177] Exs. 2 & 3. The state court plaintiffs asserted numerous claims against the UI defendants, EWTC Management, and its owners, including claims for breach of fiduciary duty, fraud, and unjust enrichment. This litigation culminated in a four week trial, and the state court plaintiffs prevailed on all claims.

McGrory Decl. [177] Ex. 4. The parties eventually reached several settlement agreements, after which SSSC assumed UI's role as sole member of SDI. Gurojot Decl. [396], Ex. 3.

### E. Plaintiffs' Claims to Board Membership

Plaintiffs allege that Bibiji and the three children should be on the SSSC Board and that Bibiji should be on the UI Board. SAC [234] ¶¶ 24–29. They assert that, before Yogi Bhajan's death, they expressed to him that they wished to become more involved in the management of the various business entities that he controlled. *See, e.g.*, Soni Decl. [394], Ex. NN (Ranbir Dep.) at 60. Plaintiffs assert that Yogi Bhajan instructed defendant Sopurkh, both orally and in writing, to add plaintiffs to the management boards of whatever business entities the family wanted. Soni Decl. [394], Ex. NN (Ranbir Dep.) at 60–61. Sopurkh testified that Yogi Bhajan asked her to talk to the family members about which boards they were interested in participating in. Soni Decl. [394], Ex. RR (Sopurkh Dep.) at 40–41.

There are several documents in the record that might indicate who Yogi Bhajan intended to be on the UI and SSSC boards. On July 10, 1997, Sopurkh emailed Yogi Bhajan and referred to "the listing of the [SSSC] board members as [Yogi Bhajan] gave them to me." Soni Decl. [394], Ex. I. This list of 13 names included Plaintiffs Bibiji and Kulbir, Defendant Sopurkh, four dismissed defendants, and seven others. *Id.* This list was faxed to Lambert on October 12, 2004, just after Yogi Bhajan died. *Id.* On October 7, 1997, Yogi Bhajan signed a separate list naming 14 individuals to the SSSC board. Southwick Decl. [398], Ex. 29. This list included the 13 names from the July 1997 email and added the name Harijot Kaur Khalsa. *Id.* There is also an undated, handwritten note that was signed by Yogi Bhajan and stated "Ranbit, Kamaljit, Kulbir will be added to SSS board." Southwick Decl. [398], Ex. 30. This note was faxed to Lambert on October 12, 2004, just after Yogi Bhajan died. *Id.* Finally, there are "Consent Minutes" from a

July 2004 UI Board of Managers meeting indicating that Bibiji was elected as manager of UI, "effective immediately." Soni Decl. [394], Ex. M.

## II.     Procedural Background

### A.     2013 Motions to Dismiss and 2017 Ninth Circuit Decision

Plaintiffs originally brought claims for: (1) declaratory relief; (2) breach of fiduciary duty; (3) fraud; (4) negligent misrepresentation; (5) tortious interference with prospective economic advantage; (6) conversion; (7) unjust enrichment; (8) RICO; (9) legal malpractice; and (1) aiding and abetting. FAC [102]. After a 2012 round of motions to dismiss and a First Amended Complaint (FAC), I granted Defendants' four motions to dismiss [125, 172, 178, 180] the FAC in full on October 11, 2013, concluding that Plaintiffs lacked standing to bring derivative claims and that the direct claims failed based on res judicata, mootness, the First Amendment's ministerial exception, Rule 9(b)'s heightened fraud standard, and/or failure to state a claim. Minutes of Proceedings [215]; Transcript of Proceedings [220]. Plaintiffs appealed. The Ninth Circuit affirmed in part, vacated in part, and remanded. In a published opinion, the Ninth Circuit concluded that dismissal pursuant to the ministerial exception or the ecclesiastical abstention doctrine was not warranted at the pleadings stage. *Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017). In an accompanying unpublished memorandum disposition, the Ninth Circuit dismissed some of Plaintiffs' claims on other grounds. *Puri v. Khalsa*, 674 F. App'x 679 (9th Cir. 2017).

### B.     2017 Motions to Dismiss, Motion for Reconsideration, and Partial Settlement

In the SAC, Plaintiffs brought five claims for declaratory relief, fraud, negligent misrepresentation, tortious interference with prospective economic advantage, and RICO/ORICO. SAC [234]. Defendants filed several Motions to Dismiss. I issued an Opinion

and Order granting in part and denying in part Defendants' Motions to Dismiss. [296]. I then

denied Plaintiffs' related Motion for Reconsideration and for Entry of Judgment Pursuant to Rule

54(b) [305], and granted in part and denied in part Plaintiffs' Motion for Leave to Amend [301].

[338]. Following these Opinions and the subsequent settlement of the claims between Plaintiffs,

Lambert, and Schwabe, the following claims remain in this case:

- Claim One (declaratory relief): direct claims against UI and SSSC by all Plaintiffs (relief of having Bibiji placed on UI board and all Plaintiffs placed on SSSC board).
- Claim Two (fraud): claim by all Plaintiffs against Sopurkh and Kartar,
- Claim Four (tortious interference): claim by all Plaintiffs against Sopurkh

### C. Motions for Summary Judgment

Defendants move for summary judgment, arguing Plaintiffs' claims are barred by the

ministerial exception, the ecclesiastical abstention doctrine, the statute of limitations, and

because they cannot show damages. [390]. Defendants also argue that certain of Plaintiffs'

claims are moot and that the Plaintiffs seek relief not included in the SAC. Plaintiffs move for

partial summary judgment on Claim One for Declaratory Relief and against each of Defendants'

affirmative defenses.[4] [389].

### LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

initial burden for a motion for summary judgment is on the moving party to identify the absence of a

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden

is satisfied, the burden shifts to the non-moving party to demonstrate, through the production of

evidence listed in Fed. R. Civ. P. 56(c)(1), that there remains a "genuine issue for trial." *Celotex*, 477

U.S. at 324. The non-moving party may not rely upon the pleading allegations, *Brinson v. Linda Rose*

---

[4] Because I conclude the ministerial exception and the ecclesiastical abstention doctrine bar review in this case, I do not reach the parties' other arguments.

*Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995) (citing Fed. R. Civ. P 56(e)), or "unsupported conjecture or conclusory statements," *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). All reasonable doubts and inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

I.      **Whether the Ministerial Exception Bars Review in this Case**

"The Supreme Court has long recognized religious organizations' broad right to control the selection of their own religious leaders." *Puri*, 844 F.3d at 1157. Pursuant to this principle, the Supreme Court has recognized a ministerial exception, which "precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012). The ministerial exception "applies to claims that impinge on protected employment decisions regarding a religious organization and its ministers, and when applicable, it flatly prohibits courts from requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so." *Puri*, 844 F.3d at 1158 (citations and internal quotation marks removed). In *Hosanna-Tabor*, the Supreme Court reasoned that judicial review of a religious group's ministerial employment decisions would constitute "government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 188.

Although "the ministerial exception is not limited to the head of a religious congregation," the Supreme Court in *Hosanna-Tabor* declined "to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. Instead, the Supreme Court put forth several guidelines for courts to consider when deciding whether the ministerial exception applies in a given case. In *Puri*, the Ninth Circuit described these considerations as follows:

> First, an employee is more likely to be a minister if a religious organization holds the employee out as a minister by bestowing a formal religious title. Although an ecclesiastical title "by itself, does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant." A second consideration is the "substance reflected in that title," such as "a significant degree of religious training followed by a formal process of commissioning." Third, an employee whose "job duties reflect [] a role in conveying the Church's message and carrying out its mission" is likely to be covered by the exception, even if the employee devotes only a small portion of the workday to strictly religious duties and spends the balance of her time performing secular functions. Finally, an employee who holds herself out as a religious leader is more likely to be considered a minister.

*Puri*, 844 F.3d at 1160 (quoting *Hosanna-Tabor*, 565 U.S. at 191–93). Courts have applied the ministerial exception to the claims of a number of different types of employees, including the claims of the "called" teacher in *Hosanna-Tabor*, 565 U.S. at 176; a musical director at a Catholic church, *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012); a principal of a parochial school, *Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. 2017); and a Hebrew teacher at a Jewish day school, *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018).

As discussed above, the Ninth Circuit concluded, based on the pleadings alone, that the ministerial exception does not bar review in this case. Although the court noted that "a 'mission and purpose' of SSSC and UI is 'to benefit the Sikh Dharma community and to advance and promote [Yogi Bhajan's] teachings,' and it is 'surely relevant' that their board members must be ordained ministers of Sikh Dharma and must meet certain other religious criteria," the court

concluded that other factors outweighed these considerations. *Puri*, 844 F.3d at 1160. In particular, the Ninth Circuit found it significant that the pleadings did not allege that: (1) the board members have ministerial duties; (2) the board members are held out as religious leaders, either by the members or their employers; or (3) that board membership required significant religious training or requirements. *Id.* at 1160–61.

The Ninth Circuit also found it important that UI and SSSC are not churches, reasoning "it is not clear that the ministerial exception could ever apply to the type of positions at issue here. This is a dispute over seats on the boards of corporate entities that are apparently affiliated with a church, but are not themselves churches." *Id.* at 1159. However, the Ninth Circuit noted that the Supreme Court suggested "a fairly broad application of the exception" in *Hosanna-Tabor*, as has the Ninth Circuit in previous cases. *Id.* (citing *Hosanna-Tabor*, 565 U.S. at 188–89; *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 947 (9th Cir. 1999)).

Defendants argue that information outside the pleadings now shows that membership on the UI and SSSC boards clearly qualifies for the ministerial exception. In particular, Defendants argue that SSSC and UI are religious organizations and that board members serve as ministers, because they hold themselves out as such and have explicitly religious duties. Plaintiffs argue that SSSC only holds administrative authority, that board members were not required until after Yogi Bhajan's death to be ministers, and that the UI and SSSC boards do not require any religious training.[5] Below, I address each of *Hosanna-Tabor*'s guidelines, the Ninth Circuit's

---

[5] Plaintiffs also argue that the Ninth Circuit's decision is law of the case, but the Ninth Circuit clearly stated its decision was based on the pleadings alone.

interpretation of those guidelines in this case, and how any new evidence outside of the pleadings may affect the ministerial exception analysis in this case.[6]

### A.    Whether UI and SSSC are Religious Groups

The Supreme Court referred to "religious groups" in *Hosanna-Tabor*, but did not offer a specific definition of "religious group." *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 196 (referencing "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission"). In a recent case, the Second Circuit noted that although the Supreme Court did not define "religious groups" in *Hosanna-Tabor*, "other circuits have applied the ministerial exception in cases involving 'religiously affiliated entit[ies],' whose 'mission[s are] marked by clear or obvious religious characteristics.'" *Penn v. New York Methodist Hosp.*, 884 F.3d 416, 424 (2d Cir. 2018) (quoting *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015)).

In this case, the Ninth Circuit determined that "[i]n assessing the responsibilities attendant to the board positions, it is relevant that the entities involved are not themselves churches, but rather corporate parents of a church." *Puri*, 844 F.3d at 1160. The Court concluded that "SSSC's primary responsibility appears to be holding title to church property, and UI, in addition to being the sole member of SDI—i.e., the direct corporate parent of the Sikh Dharma church—owns and controls a portfolio of for-profit and nonprofit corporations, including a major security contractor and a prominent tea manufacturer." *Id.* The Ninth Circuit noted that based on the pleadings, "UI and SSSC are not churches," even though the organizations have some religious purposes. *Id.* at 1160–61 (noting that "the complaint alleges that a 'mission and

---

[6] In addressing the ministerial exception, I refer to the documents in existence at the time of the "employment decisions" Defendants argue are "protected" by the exception. This means the 1997 SSSC documents and the 2003 UI and SDI documents. I therefore DENY as moot the parties' Motions to Strike [418, 424, 428] as they pertain to this issue.

purpose' of SSSC and UI is 'to benefit the Sikh Dharma community and to advance and promote [Yogi Bhajan's] teachings'"). Plaintiffs argue that nothing has changed from the pleadings stage, but Defendants argue there is new evidence showing that UI and SSSC are clearly churches or religious groups.

There is some evidence that UI and SSSC are not churches, or at the very least, have some secular duties. As the Ninth Circuit described, SSSC and UI hold assets and oversee several subsidiaries, including for-profit companies like East-West Tea Company and Akal Security. Gurojodha Decl. [395], Ex. 7. And relevant documents sometimes describe their roles as "administrative" or overseeing the "program services" of SDI. *See* Southwick Decl. [398], Ex. 44; Gurojodha Decl. [395], Ex. 3 at 17.

But I conclude that evidence outside of the pleadings[7] show that SSSC and UI are "religious groups," even if they are not churches in the traditional sense.[8] First, SSSC received a tax exemption as a "church or a convention or association of churches." Gurojodha Decl. [395] ¶ 32; *id.* Ex. 3. Referring to Yogi Bhajan's role as "current leader of the Sikh religion in the Western Hemisphere," the tax documents stated SSSC was to be Yogi Bhajan's "successor, to fulfill his leadership functions following his death." Gurojodha Decl. [395], Ex. 3 at 17, 20.

Other documents state that SSSC's purposes include "conduct[ing] and/or facilitat[ing] religious, charitable, and educational activities." Soni Decl. [394], Ex. C, Art. VI. And according

---

[7] The Plaintiffs agreed at oral argument that to decide whether SSSC and UI are religious groups, I should look only to governing documents in existence at the time of the events in question, not to the declarations in the record. Minutes [433].

[8] There are several reasons why this case does not fit neatly into the precedents set by prior case law. First, it involves a religion not within the Judeo-Christian tradition, which is most commonly addressed by the case law. *But see Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244 (9th Cir. 1999) (addressing the competing claims of individuals in an ancient Sufi order). This precedent presumes there are relatively clear distinctions between religious and secular purposes. Here, by contrast, it is by no means straightforward to determine that, for example, running yoga clinics is a secular endeavor, instead of part of the Sikh Dharma religious message. Additionally, this case addresses a dispute during a time when the Sikh Dharma hierarchy was evolving. During his illness and up to the time of his death, Yogi Bhajan was in the process of creating several new structures to replace him as the leader of Sikh Dharma in the Western Hemisphere.

to SSSC's 1997 Articles, the SSSC board also had the duty to choose a new Siri Sikdar Sahib/a—one of the two religious leaders of the Sikh Dharma religion in the Western Hemisphere—in the case that Yogi Bhajan did not choose such an individual. Soni Decl. [394], Ex. B at 4–5; Gurojot Decl. [396], Ex. 9 at 12. And SSSC was to make this decision with the advice of the Khalsa Council Adh Kari, SDI's board of directors, and with nominations from the Khalsa Council, SDI's ministerial board—two clearly religious bodies. Soni Decl. [394], Ex. B at 4–5; Gurojot Decl. [396], Ex. 9 at 12.

Similarly, according to the 2003 SDI Amended and Restated Operation Agreement, UI had a significant role in running the religious affairs of SDI. UI was to approve or elect nearly all religious and administrative leaders of SDI. Gurojot Decl. [396], Ex. 9 at 2–14 (UI to choose the directors of the Khalsa Council Adh Kari and the Khalsa Council, the Executive Officers of SDI, the Secretary General of SDI, and "designat[ing] such other religious or administrative officials of [SDI] as it deems appropriate"). UI could also remove employees, including the Siri Sikdar Sahib/a if the Siri Sikdar Sahib/a died or was incapacitated. Gurojot Decl. [396], Ex. 9 at 2–14. UI also had final authority over all actions of the Khalsa Council Adh Kari and could amend the Articles and Bylaws of SDI. Gurojot Decl. [396], Ex. 9 at 2–14.

In my view, these documents show that although SSSC and UI do act as corporate boards in some ways, they were also formed to perform Yogi Bhajan's leadership role in approving religious policy and leaders. Although both organizations perform some secular functions, they appear to be "religiously affiliated entities" with clearly religious purposes. *See Penn*, 884 F.3d at 424. Taking this information into consideration, I now address *Hosanna-Tabor*'s other guidelines.

## B.    Whether the Board Members Have Formal Religious Titles

The Ninth Circuit acknowledged that board members must be ministers, but concluded that "[a]n employee's status as an ordained minister, standing alone, does not trigger the ministerial exception when that individual is employed in a secular capacity by an entity other than a church." *Puri*, 844 F.3d at 1161. I take this to mean that formal religious titles can satisfy this first prong of the *Hosanna-Tabor* analysis, but do not control the outcome. Here, Plaintiffs do not dispute that the UI Amended and Restated Operating Agreement required board members to be qualified as Sikh Dharma ministers and included other religious qualifications. *See* Southwick Decl. [398], Ex. 22 at 3–4. But appears that the SSSC ministerial qualifications came into effect immediately after Yogi Bhajan's death and may not have applied at the time of the "employment decision" disputed by Plaintiffs. I therefore conclude this factor weighs in favor of applying the ministerial exception to Plaintiffs' claims against UI and against applying the ministerial exception to Plaintiffs' claims against SSSC.[9]

## C.    Religious Training and Other Religious Requirements

The Ninth Circuit noted that the pleadings did not allege that board membership required significant religious training or requirements. *Puri*, 844 F.3d at 1161. The Defendants do not specifically allege that board membership requires religious training, or detail what is required to become a minister with SDI. I therefore conclude this factor weighs against applying the ministerial exception to Plaintiffs' claims.

---

[9] SSSC's evolution over the past fifteen years raises the novel question of how to apply the ministerial exception to an organization which has assumed more religious characteristics over time. I have only considered documents describing SSSC prior to Yogi Bhajan's death in analyzing the ministerial exception, because the term "protected employment decision" appears to apply to a particular moment in time. But doing so fails to take into account the fact that granting a remedy to Plaintiffs regarding SSSC would affect SSSC now, a significantly religious organization. Viewed in this light, the "formal title" factor would weigh in favor of applying the ministerial exception to SSSC, which now requires such titles for board members.

### D.  Job Duties

The Ninth Circuit found it significant that the pleadings did not allege that the board members have ministerial duties. *Puri*, 844 F.3d at 1160. Defendants argue that "the SSSC and UI Board positions carry a responsibility to convey the Sikh Dharma message and carry out its mission." Def. MSJ [390] at 23. Plaintiffs argue there are no ministerial requirements or religious job duties listed in the then-applicable 1997 Articles and Bylaws for SSSC, or in UI's governing documents. *See* Soni Decl. [394], Ex. B (SSSC Articles of Incorporation); Soni Decl. [394], Ex. C, Art. VI; Southwick Decl. [398], Ex. 21 at 1.

In my view, the evidence not available at the pleadings stage changes considerably the analysis of this factor. On one hand, Plaintiffs are correct that the section of the SSSC Bylaws entitled "Duties" makes no reference to religion. *See* Soni Decl. [394], Ex. C, Art. 2. But on the other hand, the boards members of SSSC and UI have some express religious duties. SSSC was to choose a new Siri Sikdar Sahib/a, one of the two religious positions to exist after Yogi Bhajan's death, in the event that Yogi Bhajan did not choose such an individual. Soni Decl. [394], Ex. B at 4–5. And as discussed above, UI had the power to choose and remove many of SDI's religious leaders, approve the decisions of the Khalsa Council Adh Kari, and amend the bylaws and articles of SDI. Gurojot Decl. [396], Ex. 9 at 2–14. Furthermore, some of the Plaintiffs testified that they were appointed to "spread the word of [Yogi Bhajan's] mission," including "the word of the Holy Scripture," and "teach the Sikh way of life." Southwick Decl. [419], Ex. 1 (Bibiji Dep.) at 59-60.

The duties of the board members do not fit neatly into case law, which often involves religious educators. *See, e.g. Hosanna-Tabor*, 565 U.S. at 192 (noting the plaintiff was "expressly charged . . . with 'lead[ing] others toward Christian maturity' and 'teach[ing]

faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church'"). But in my view, the board members of UI and SSSC have important religious duties: they may choose and remove religious leaders, and approve religious decisions and governing documents. Although the board members do not act as teachers, they have significant religious duties that allow them to shape the future of the Sikh Dharma religion through its religious employees, governing documents, and the decisions of its board of directors. In the context of SSSC's and UI's leadership roles in relation to SDI, these facts weigh strongly in favor of applying the ministerial exception to Plaintiffs' claims.

### D. Whether Board Members or the Board Hold the Members Out as Religious Leaders

The Ninth Circuit found it significant that the pleadings did not allege that the board members are held out as religious leaders, either by the members themselves or their employers. *Puri*, 844 F.3d at 1160. However, there is evidence not available at the pleadings stage that both the Plaintiffs and their potential "employers" viewed these positions as involving religious leadership components. In their depositions, the Plaintiffs testified that they were appointed to "spread the word of [Yogi Bhajan's] mission," including "the word of the Holy Scripture," and "teach the Sikh way of life." Southwick Decl. [419], Ex. 1, (Bibiji Dep.) at 59-60; *see also* Southwick Decl. [398], Ex. 10 at 116 (Kulbir agreeing with the statement that board members would "generally be in a position to engage in that kind of outreach to religious leaders"). Furthermore, the Plaintiffs admitted "that the members of the SSSC Board of Trustees hold positions of leadership within the Sikh Dharma community by virtue of their position as SSSC Trustees." Southwick Decl. [398], Ex. 1 at 4. In terms of the boards themselves, it is clear from the governing documents of SSSC, UI, and SDI that the board members of SSSC and UI were to play an important role as religious leaders, in choosing and removing subordinate religious

leaders, and by affecting religious policy. Given these facts, I conclude this factor weighs in favor of applying the ministerial exception to Plaintiffs' claims.

Considering the role UI and SSSC were to play in the hierarchy of Sikh Dharma and these four factors, I conclude the application of the ministerial exception is a close call. On one hand, the board members of SSSC did not appear to need a religious title at the time of the employment decision in question. And neither board appeared to require religious training. Furthermore, this case falls outside the typical cases in which the ministerial exception applies, which tend to involve religious educators. On the other hand, the Supreme Court suggested "a fairly broad application of the exception" in *Hosanna-Tabor*. *Puri*, 844 F.3d at 1159 (citing *Hosanna-Tabor*, 565 U.S. at 188–89). I conclude the importance of each board in the religious hierarchy of Sikh Dharma at the time Plaintiffs allege they were appointed to the board is particularly relevant. And there were significant religious duties involved in these leadership positions, including choosing and firing religious leaders, approving the governing documents of SDI, and approving the actions of SDI's board of directors.

Given this religious structure and the ministerial leadership roles played by the board members, I conclude that judicial review of the decisions to not place Plaintiffs on the UI and SSSC boards falls within the purpose of the ministerial exception, as it would constitute "government interference with an internal church decision that affects the faith and mission of the church itself." *See Hosanna-Tabor*, 565 U.S. at 190. In effect, Plaintiffs seek court interference in the membership of the boards that choose Sikh Dharma's highest level of leadership and exercise significant control over the direction of the Sikh Dharma religious in the Western Hemisphere. Therefore, the ministerial exception bars review in this case.

**II.    Whether the Ecclesiastical Abstention Doctrine Bars Review in this Case**

Because this case does not involve the typical application of the ministerial exception, I address in the alternative whether the ecclesiastical abstention doctrine applies. The ecclesiastical abstention doctrine is based on courts' determination that "[t]he Free Exercise Clause restricts the government's ability to intrude into ecclesiastical matters or to interfere with a church's governance of its own affairs." *Bollard*, 196 F.3d at 945. "Under this doctrine of ecclesiastical abstention, 'a State may adopt any one of various approaches for settling church . . . disputes so long as it involves no consideration of doctrinal matters.'" *Puri*, 844 F.ed at 1162 (quoting *Jones v. Wolf*, 443 U.S. 595, 602 (1979)). But "[u]nlike the ministerial exception, which completely bars judicial inquiry into protected employment decisions, the ecclesiastical abstention doctrine is a qualified limitation, requiring only that courts decide disputes involving religious organizations without resolving underlying controversies over religious doctrine." *Puri*, 844 F.3d at 1164 (internal quotation marks and citation omitted). To this end, the Supreme Court held in *Jones* that "civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve [church property] dispute[s] on the basis of 'neutral principles of law.'" *Jones*, 443 U.S. at 597. The Ninth Circuit noted in this case that "we are unaware of any authority or reason precluding courts from deciding other types of church disputes by application of purely secular legal rules, so long as the dispute does not fall within the ministerial exception and can be decided without resolving underlying controversies over religious doctrine." *Puri*, 844 F.3d at 1165 (internal quotation marks and citation omitted).

Here, the Ninth Circuit concluded that a neutral-principles approach may be appropriate, because "the plaintiffs here ask the courts to decide what amounts to a secular factual question: under Oregon law and the secular governing documents of UI, an Oregon nonprofit limited

liability company, and SSSC, an Oregon nonprofit religious corporation, were the plaintiffs elected or designated to the disputed board positions?" *Id.* at 1167. The Ninth Circuit noted the Plaintiffs do not ask "for resolution of a controversy over religious doctrine. Nor do they ask civil courts to decide whether a religious organization properly applied ecclesiastical rules in settling a leadership dispute[.]" *Id.*

Defendants argue that evidence beyond the pleadings show that Plaintiffs do, in fact, ask the court for resolution of a question of religious doctrine: whether Yogi Bhajan's succession plan as to the religious leadership of the UI and SSSC boards. Plaintiffs disagree, arguing that neutral principles can clearly resolve this issue. Given my conclusions that UI and SSSC are religious organizations, and that board membership constitutes a religious leadership role in SDI, I look to see how the case law that the Ninth Circuit previously distinguished from this case may now apply to the facts of this case.

In *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952), the Supreme Court considered whether a state court could determine which faction of the Russian Orthodox Church was entitled to the Russian Orthodox Cathedral in New York City. *Id.* at 95–97. The state court applied a state law requiring that the decisions of the American churches be authoritative. *Id.* at 99. The Supreme Court reversed, holding that the application of the state law "displace[d] one church administrator with another" and "passe[d] the control of matters strictly ecclesiastical from one church authority to another." *Id.* at 119. This was unconstitutional, concluded the Court, because it placed the "power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." *Id.* at 119. Similarly, in *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696 (1976), the Supreme Court considered a case in which a

state court reinstated a bishop because the church had failed to follow its own constitution, as interpreted by the court. 426 U.S. at 707–08. Again the Supreme Court reversed, holding that the state court had "unconstitutionally undertaken the resolution of quintessentially religious controversies." *Id.* at 720.

In *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244 (9th Cir. 1999), the Ninth Circuit considered a dispute involving corporate bodies competing over trademarks related to a Sufi order. The Court concluded that the ecclesiastical abstention doctrine did not bar review of the trademark claims in the case. *Id.* at 1250. But in a separate claim, the plaintiffs asked that the defendants be enjoined "from representing that the Order ceased to exist with the death of the Forty–First Teacher, and that they are teachers or masters of the Order." *Id.* The Ninth Circuit held that "[t]he district court cannot determine by neutral principles the legitimacy of [the religious leader's] succession; that kind of determination could only be made by a recognized decision-making body of the Order itself." *Id.*

Here, as in *Kedroff, Milivojevich*, and *Kianfar*, Plaintiffs ask the Court to adjudicate a church leadership dispute. Like in *Kedroff*, the Plaintiffs here ask the Court to "displace[] one church administrator with another." *See* 344 U.S. at 119. And although the UI and SSSC board members are not bishops, as in *Milivojevich*, the board members have significant religious leadership roles within SDI. This case is perhaps most akin to *Kianfar*, which also involved competing corporate entities linked to a religious organization. The Plaintiffs ask the Court to determine the legitimacy of the SSSC board, which was to be Yogi Bhajan's "successor, to fulfill his leadership functions following his death," Gurojodha Decl. [395], Ex. 3 at 17, and of the UI board, which took over Yogi Bhajan's decisionmaking role as to certain religious decisions within SDI. In my view, this would require the Court to improperly "determine . . . the

legitimacy of [the religious leader's] succession," because such a "determination could only be made by a recognized decision-making body of [SDI] itself." *Kianfar*, 179 F.3d at 1250.

The concerns this case raises are even more apparent when considering the current status of the boards, and SSSC in particular. SSSC's current mission statement includes an explicitly religious purpose. *See* Gurojodha Decl. [395] ¶ 25 (SSSC to protect assets, support non-profit and for-profit entities, and "live to and hold the values of the teachings of the Siri Guru Granth Sahib and the Siri Singh Sahib Bhai Sahib Harbhajan Singh Khalsa Yogi Ji: selfless service, compassion, kindness, honesty, integrity, trustworthiness and Guru inspired consciousness"). And the SSSC board now has religious duties similar to those of the original UI board. Gurojodha Decl. [395] ¶ 28 ("SSSC has the authority to appoint and remove the board members of Sikh Dharma International (SDI), which, among other things, contains the Sikh Dharma Ministry and, through the Ministry, carries out the function of ordaining Sikh Ministers."). Board members participate in religious outreach "as representatives and ambassadors of Sikh Dharma." Gurojodha Decl. [395] ¶ 39. Finally, the current election process for SSSC requires board members to be elected by fellow Sikh Dharma ministers, active Khalsa Council members, and members of the Sikh Dharma community pursuant to the terms of the SSSC Board Election Policy," but in the future, "only Sikh Dharma ministers who are in good standing will be eligible to vote for SSSC Board members." Gurojodha Decl. [395] ¶ 16.

To grant plaintiffs' requested relief, this Court would have to determine the legitimacy of Yogi Bhajan's succession. Additionally, this relief would place Plaintiffs at the helm of religious institutions, thus displacing board members chosen by other methods. In my view, this raises a "substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs." *See Milivojevich*, 426 U.S.

at 709. I therefore conclude the ecclesiastical abstention doctrine also bars review of the claims in this case.[10]

## CONCLUSION

For the reasons stated above, I GRANT Defendants' Motion for Summary Judgment [390], DENY Plaintiffs' Motion for Partial Summary Judgment [389], and DENY or DENY as moot the parties' Motions to Strike [418, 424, 428]. This case is therefore DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED this 26 day of April, 2018.

MICHAEL W. MOSMAN
Chief United States District Judge

---

[10] Because I conclude the ministerial exception and the ecclesiastical abstention doctrine bar review in this case, I do not reach the parties' other arguments.